ORIGINAL

Approved: _____
MATTHEW WEINBERG
Assistant United States Attorney

Before:   THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - X

## 22 MAG 1877

UNITED STATES OF AMERICA

- v. -

FRANKLIN RAY and
JOSEPH WINGET,

                    Defendants.

- - - - - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 1028A,
1343, 1349, and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ROBERT N. STOUT, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

### COUNT ONE
(Conspiracy to Commit Wire Fraud)

        1.    From at least in or about June 2020 through at least
in or about March 2021, in the Southern District of New York and
elsewhere, FRANKLIN RAY and JOSEPH WINGET, the defendants, and
others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

        2.    It was a part and object of the conspiracy that
FRANKLIN RAY and JOSEPH WINGET, the defendants, and others known
and unknown, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, knowingly transmitted
and caused to be transmitted by means of wire, radio, and
television communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds, for the purpose

of executed such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

(Title 18, United States Code, Section 1349 and 2.)

**COUNT TWO**
(Wire Fraud)

3.    From at least in or about June 2020 through at least
in or about March 2021, in the Southern District of New York and
elsewhere, FRANKLIN RAY and JOSEPH WINGET, the defendants,
having devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises,
knowingly transmitted and caused to be transmitted by means of
wire, radio, and television communication in interstate and
foreign commerce, writings, signs, signals, pictures, and
sounds, for the purpose of executed such scheme and artifice, to
wit, RAY and WINGET engaged in a scheme to obtain Government-
guaranteed loans by means of false and fraudulent pretenses,
representations, and documents, for a company controlled by RAY
and WINGET, namely CSA Business Solutions LLC ("CSA Business"),
through two loan programs of the United States Small Business
Administration (the "SBA") designed to provide relief to small
businesses during the COVID-19 pandemic, namely the Paycheck
Protection Program (the "PPP") and the Economic Injury Disaster
Loan ("EIDL") program.

(Title 18, United States Code, Section 1343 and 2.)

**COUNT THREE**
(Aggravated Identity Theft)

4.    In or about July 2021, in the Southern District of New
York and elsewhere, FRANKLIN RAY and JOSEPH WINGET, the
defendants, knowingly did transfer, possess, and use, without
lawful authority, a means of identification of another person,
during and in relation to a felony violation enumerated in Title
18, United States Code, Section 1028A(c), to wit, RAY and WINGET
used names and social security numbers of certain individuals in
connection with fraudulent loan applications made during and in
relation to the fraud charges in Count One and Count Two of this
Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b),
and 2.)

**COUNT FOUR**
(Wire Fraud)

5.    From at least in or about December 2020 through in or about February 2021, in the Southern District of New York and elsewhere, FRANKLIN RAY, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, RAY, after providing false information about CSA Business and his own personal business experience and relationships, fraudulently induced a payment of $175,000 from a New York based real estate investment and development holding company (the "Holding Company") purportedly to assist in establishing a joint venture between the Holding Company and CSA Business (the "Joint Venture").

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6.    I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter.  I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents and witnesses, and my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Overview of PPP and EIDL Programs**

7.    Based on my involvement in this investigation, including my review of publicly available information disseminated by the SBA, I am aware of the following, in substance and in part:

a.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 29, 2020 designed to provide emergency financial assistance to the

millions of Americans who are suffering the economic effects
caused by the COVID-19 pandemic.  One source of relief provided
by the CARES Act was the authorization of up to $349 billion in
forgivable loans to small businesses for job retention and
certain other expenses through the PPP.  On April 24, 2020, the
Paycheck Protection Program and Health Care Enhancement Act were
signed into law, authorizing over $300 billion in additional PPP
funding.

      b.   The PPP allows qualifying small businesses and
other organizations to receive unsecured SBA-guaranteed loans
with a maturity of two years and interest rate of one percent.
PPP loan proceeds must be used by businesses on payroll costs,
mortgage interest, rent, and/or utilities.  The PPP allows the
interest and principal to be forgiven if businesses spend the
proceeds on these expenses under certain conditions.  Pursuant
to the CARES Act, the amount of PPP funds a business is eligible
to receive is determined by the number of employees employed by
the business and its average payroll costs.  Businesses applying
for a PPP loan must provide documentation to confirm that they
have in the past paid employees the compensation represented in
the loan application.  The PPP is overseen by the SBA, which has
authority over all PPP loans, but individual PPP loans are
issued by approved commercial lenders who receive and process
PPP applications and supporting documentation, and then make
loans using the lenders' own funds.

      c.   The CARES Act also expanded the separate EIDL
Program, which provided small businesses with low-interest loans
up to $2 million, and can provide vital economic support to help
overcome the temporary loss of revenue they are experiencing due
to COVID-19.  To qualify for an EIDL under the CARES Act, the
applicant must have suffered "substantial economic injury" from
COVID-19, based on a company's actual economic injury determined
by the SBA.  EIDLs may be used for payroll and other costs as
well as to cover increased costs due to supply chain
interruption, to pay obligations that cannot be met due to
revenue loss, and for other similar uses.  The CARES Act also
permitted applicants to request an advance of up to $10,000 to
pay allowable working capital needs, which was expected to be
paid by the SBA within three days of submission of an EIDL
application to the SBA, provided the application contains a
self-certification under penalty of perjury of the applicant's
eligibility for an EIDL.  Unlike the PPP, the SBA directly makes
loans to applicants under the EIDL Program.

      d.   In early 2021, the SBA began offering what was
termed "Second Draw" PPP loans.  A Second Draw PPP loan was

generally available to borrowers who had previously received a PPP loan and (i) had or would be using the full amount of that loan for authorized purposes, (ii) had 300 or fewer employees, and (iii) could demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020.

## The CSA Business EIDL and PPP Loan Schemes

*Overview*

8.    Between at least in or about June 2020 and in or about December 2020, FRANKLIN RAY and JOSEPH WINGET, the defendants, fraudulently submitted numerous EIDL and PPP loan applications in the name of CSA Business.  The EIDL and PPP loan applications contained numerous misrepresentations about CSA Business, including, among other things, misstatements about its revenues, business operations, payroll expenses, and number of employees. In support of the applications, RAY and WINGET submitted forged bank account statements and tax documents.  Finally, in the applications, RAY and WINGET falsely represented that the loan proceeds would be used for payroll expenses.

9.    As a result of these applications, the SBA and a commercial lender ("Lender-1") issued EIDL and PPP loans to CSA Business totaling approximately $1,130,337.  The funds obtained pursuant to the EIDL and PPP loan applications were not used for payroll purposes.  Instead, the funds were moved to personal bank accounts held by FRANKLIN RAY and JOSEPH WINGET, the defendants, and otherwise used for their own purposes.

10.   Between approximately January 2021 and March 2021, FRANKLIN RAY and JOSEPH WINGET, the defendants, submitted additional EIDL and PPP loan applications on behalf of CSA Business.  These too contained forged documents and material misrepresentations about CSA Business and the intended use of the loans.  CSA Business did not ultimately receive additional funding pursuant to the PPP in 2021.

*The June 2020 EIDL Loan*

11.   Based on my review of bank account records and information provided by the SBA, I know the following with respect to an EIDL loan issued by the SBA to CSA Business Solutions:

a.    On or about June 17, 2020, CSA Business electronically submitted an application for an EIDL loan with the SBA (the "EIDL Application").

b.    The EIDL Application stated that the owner of CSA Business was JOSEPH WINGET, the defendant.  The EIDL Application provided a particular phone number as the company's business phone number (the "Winget Phone Number")[1] and a particular address as the company's business address (the "Winget Residence").[2]

c.    The EIDL Application further stated, among other things, that CSA Business was established on January 11, 2019, that CSA Business had gross revenues of $12,536,004 for the twelve months prior to January 31, 2020, and that CSA Business had 65 employees as of January 31, 2020.

d.    The EIDL Application requested an advance of up to $10,000, as provided by the CARES Act, and included the required self-certification of the applicant's eligibility for an EIDL in order to obtain the advance.

e.    On or about June 19, 2020, CSA Business was granted an EIDL loan from the SBA in the amount of $150,000.

f.    On or about June 22, 2020, a bank account held at a particular financial institution ("Bank-1") in the name of CSA Business (the "CSA Bank Account") received two payments from the SBA.[3]  The first, a payment of $149,900, was the funding of the EIDL loan.  The second, a payment of $10,000, was the EIDL advance provided by the CARES Act.

12.  Based on my review of bank account records and records provided by the Internal Revenue Service ("IRS"), the Michigan Department of Treasury, and the Michigan Department of Licensing and Regulatory Affairs, I know that statements made by CSA

---

[1] Based on my review of records from a cellular service provider, I know that the subscriber of the Winget Phone Number is Winget's wife ("Winget's Wife").  As described at paragraph 26.a *infra*, I further understand that, in connection with a PPP loan application submitted by CSA Business, a representative of Lender-1 spoke to an individual believed to be WINGET by contacting the Winget Phone Number.

[2] Based on my review of public records maintained by a particular county in the state of Michigan, I know that, during the relevant time period, WINGET and Winget's Wife held a mortgage loan associated with the address for the Winget Residence.

[3] Based on my review of bank account records, I know that WINGET was identified as the signatory for the account in the account opening documents.

Business in its EIDL Application were false.  Specifically, in truth and in fact, CSA Business was incorporated in the state of Michigan in or around December 2019, and reported no taxable income or revenues for the 2019 tax year.

13.  Based on my review of bank account records, I also know that the funds received by CSA Business pursuant to the EIDL Application were not used for payroll expenses and do not appear to have been used for any legitimate business purpose. Specifically, on or about June 22 and June 23, 2020, after receiving the funds pursuant to the EIDL Application, there were numerous withdrawals from the CSA Bank Account, including several withdrawals that went directly to FRANKLIN RAY and JOSEPH WINGET, the defendants, and/or their family members.  For example:

a.  On or about June 22, 2020, the CSA Bank Account wired $20,000 to an account in RAY's name at another bank ("Ray Personal Bank Account-1").

b.  On or about June 22, 2020, a check in the amount of $18,000 was issued from the CSA Bank Account and made payable to WINGET's Wife.  The check was deposited into an account in the name of WINGET and WINGET's Wife at another bank ("Winget Personal Bank Account-1").

c.  On or about June 23, 2020, a cashier's check in the amount of $47,800 was purchased with funds from the CSA Bank Account.  That cashier's check was deposited into Winget Personal Bank Account-1.

*The June 2020 PPP Applications and Loan*

14.  Based on my review of an email account with the email address "csabusinessllc" at a particular email service provider (the "CSA Business Email Account"), I know the following:

a.  The account holder for the CSA Business Email Account is identified as "josepsh winget" [sic].  However, the "recovery" phone number for the account, that is, the phone number which can be used to access the account should the account holder lose access to it, is a phone number known to be used by FRANKLIN RAY, the defendant (the "Ray Phone Number").[4]

_____

[4] Based on my review of records from a cellular service provider, I know that the subscriber of the Ray Phone Number is RAY's wife.  I know that RAY uses the Ray Phone Number because, among other things, it is the phone number that that was used by principals at the Holding Company to reach RAY in the course of

The recovery email address is the name "Frank" at an email domain associated with a business located in the state of Michigan.  Furthermore, the CSA Business Email Account has been accessed from an Internet Protocol ("IP") address associated with RAY's residential address in Michigan.[5]

b.    In or about June 2020, CSA Business submitted several applications for PPP loans.  These applications – which stated that CSA Business was owned by JOSEPH WINGET, the defendant, and provided the Winget Phone Number and Winget Residence as the company's business phone number and address – were typically submitted electronically to small business lending platforms which, in turn, submitted the applications electronically to the SBA and commercial lenders who ultimately funded the loans.  At least one of these applications was submitted to a lending platform based in the Southern District of New York ("Platform-1").

*PPP Application to Platform-1*

15.   Based on my communications with a representative of Platform-1, I know that Platform-1's corporate headquarters are located in Midtown Manhattan.  Platform-1's email servers are physically located inside of Platform-1's headquarters.

16.   Based on my review of the CSA Business Email Account, I know the following:

a.    On or about June 9, 2020, CSA Business created an account with Platform-1.

b.    On or about June 11, 2020, a representative of Platform-1 sent an email to the CSA Business Email Account thanking CSA Business for its PPP loan inquiry and requesting certain documentation in order to submit the application to the SBA.

---

their discussions in December 2020 and January 2021.  *See, e.g.,  infra* paragraphs 37 and 40.

[5] The records from the internet provider indicate that RAY is the account holder for the IP address associated with this residential address.  In addition, law enforcement officers conducting physical surveillance have observed RAY entering and exiting the residence at times of day and in a pattern consistent with it being his residence.

     c.   On or about June 14, 2020, CSA Business submitted the requested information to Platform-1 by email.  Attached to the email were numerous documents, including:

        i.   An IRS Form 1120-S, purporting to be the federal income tax return filed by CSA Business for the calendar year 2019 (the "Purported 2019 Form 1120-S");

        ii.   An IRS Form 941, purporting to be the quarterly federal tax return filed by CSA Business for the first quarter of 2020 (the "Purported 1Q 2020 Form 941"); and

        iii.   A purported account statement for the CSA Bank Account for the period February 1, 2020 through February 28, 2020 (the "Purported February 2020 Bank Account Statement").

17.  Based on my review of the CSA Bank Account and records from the IRS, I know that each of the documents sent by CSA Business to Plaftorm-1 by email on or about June 14, 2020 were fraudulent; that is, they were not true and accurate copies of documents filed with the IRS and/or provided by a bank. Specifically:

     a.   CSA Business did not file with the IRS any Form 1120-S for the calendar year 2019 or any Form 941 for the first quarter of 2020.

     b.   The CSA Bank Account had a balance as of February 1, 2020 of $-17.50 and a balance as of February 28, 2020 of $8.50.  During the month of February 2020, there was only one deposit into the account, for $60.00, on or about February 25, 2020.  By contrast, the Purported February 2020 Bank Account Statement reflected that the CSA Bank Account had a balance as of February 1, 2020 of $512,062.70 and a balance as of February 28, 2020 of $340,191.04.  The Purported February 2020 Bank Account Statement showed 51 deposits into the account during the month of February 2020 totaling $700,782.45.

18.  Based on my review of the CSA Business Email Account, I know that, on or about June 16, 2020, a representative of Platform-1 emailed the CSA Business Email Account and requested that CSA Business provide copies of additional tax filings, specifically the company's Federal Unemployment Tax Return, known as the IRS Form 940, for the year 2019.  Later that day, the CSA Business Email Account responded with images of what purported to be an IRS Form 940 filed by CSA Business for the calendar year 2019 (the "Purported 2019 Form 940").

19.  Based on information provided by the IRS, I know that the Purported 2019 Form 940 provided by CSA Business to Platform-1 on or about June 16, 2020 was fraudulent, and that no such document was filed with the IRS by CSA Business.

20.  Based on my review of the CSA Business Email Account, I know that, on or about June 17, 2020, the CSA Business Email Account sent an email to Platform-1 asking, in sum and substance, for an update on the status of its application.  A representative of Platform-1 replied by seeking clarification about the Purported 2019 Form 940, and specifically why it appeared that payroll expenses for 2019 as indicated on the Purported 2019 Form 940 were "significantly lower" than payroll expenses for the first quarter of 2020 alone as indicated on the Purported 1Q 2020 Form 941.  The CSA Business Email Account responded that CSA Business had grown in December 2019 due to its relationship with a particular multinational e-commerce company (the "e-Commerce Company").

21.  Based on my review of records from the e-Commerce Company, I know that this statement was untrue.  In truth and fact, CSA Business had no formal business relationship with the e-Commerce Company in December 2019 and derived no revenues from the e-Commerce Company during that calendar year.

22.  Based on my review of the CSA Business Email Account, I know the following:

a.  On or about June 17, 2020, the representative of Platform-1 informed CSA Business that Platform-1 could only seek to qualify CSA Business for a loan in the amount of $87,500.

b.  On or about June 18, 2021, CSA Business sent the representative of Platform-1 a PPP application seeking a loan in the amount identified by Platform-1, that is, $87,500.  The representative of Platform-1 responded that Platform-1 would submit the application to the SBA "right away" and would hear back by the end of the day.

c.  On or about June 19, 2020, CSA Business asked the representative of Platform-1 if there was an update on its loan application.  The representative of Platform-1 replied that Platform-1 had submitted the file to the SBA and had received notification that CSA Business had already been approved for a PPP loan with another lender.  The representative of Platform-1 informed CSA Business that it could only qualify for one PPP loan.

d.

*CSA Business Obtains a PPP Loan From Lender-1 Through Platform-2*

23.   Based on my review of the CSA Business Email Account, I know the following:

a.   During the period of time that CSA Business was corresponding with Platform-1 about a potential PPP loan, CSA Business was also pursuing PPP loans through other platforms. For example, on or about June 14, 2020, CSA Business submitted a PPP application to another small business lending platform ("Platform-2").  Platform-2 subsequently submitted the application to the SBA on behalf of CSA Business.

b.   Between on or about June 14, 2020 and on or about June 24, 2020, CSA Business and a representative of Platform-2 exchanged numerous emails in which the representative of Platform-2 informed CSA Business that its application had been approved by the SBA, that the loan would be funded by Lender-1, and that Lender-1 would be contacting CSA Business to request information and documentation necessary to close the loan.

c.   On or about June 24, 2020, a representative of Lender-1 emailed CSA Business to request certain information and documentation in order to close on the loan.

d.   Later that day, CSA Business informed the representative of Lender-1 that it had uploaded the requested materials to Platform-2's online portal.  The loan application uploaded to that portal claimed that CSA Business had an average monthly payroll of $468,756 and for 65 employees, and sought a loan in the amount of $1,171,800.  The application further stated that the purpose of the loan was "payroll."

e.   CSA Business provided false documents to Lender-1 in connection with its PPP application, including the Purported 2019 Form 1120-S, the Purported 1Q 2020 Form 941, the Purported 2019 Form 940, and the Purported February 2020 Bank Account Statement.

f.   On or about June 30, 2020, a representative of Lender-1 informed CSA Business that Lender-1 required additional information in order to close the loan.  Included among the requested additional information were copies of IRS Forms W-2 for all employees for the calendar year 2019.  After additional correspondence about what CSA Business needed to provide in order to comply with this request, Lender-1 clarified on or about July 1, 2021 that it needed the actual Forms W-2.  CSA Business wrote that same day that it would send the forms "as soon as the accountant gets in."

g.   Later that day, on or about July 1, 2021, CSA Business sent an email to a representative of Lender-1 which attached a PDF file purporting to include true and correct copies of Forms W-2 for calendar year 2019 for 68 individuals, including FRANKLIN RAY, the defendant.

24.   Based on information provided by the Social Security Administration ("SSA"), I know that the vast majority of the W-2s submitted by CSA Business to Lender-1 were fraudulent, in that the social security number included on the W-2 did not correspond to the individual listed on the W-2 provided by CSA Business.  In approximately 50 instances, the provided social security number was, in fact, a real social security number assigned to an individual, but not the individual identified on the W-2.  In 12 instances, the provided social security number is not, in fact, assigned to any individual.  In four instances, the social security number included on the W-2 did correspond to the true and correct social security number of the individual listed on the W-2.

25.   Based on my review of the CSA Business Email Account, I know that, on or about July 3, 2020, another representative of Lender-1 (the "Lender-1 Employee") emailed CSA Business. The Lender-1 Employee wrote that she was preparing the loan documents and had "several questions."  The email was addressed to "Frank," and said that the Lender-1 Employee had "just spoke to Joe and he said to talk to you."

26.   Based on my review of records for the Winget Phone Number, I know the following:

a.   On or around July 3, 2020, a telephone number associated with Lender-1 spoke on three separate occasions with the Winget Phone Number – including prior to the email sent by the Lender-1 Employee to the CSA Business Email Account referenced in paragraph 25 *supra*.

b.   On or about July 3, 2020, the Winget Phone Number had eight conversations with the Ray Phone Number.

c.   Among the eight phone calls between the Winget Phone Number and the Ray Phone Number on or about July 3, 2020 was one call which lasted 32 minutes, another call that lasted 25 minutes, and a third call that lasted 23 minutes.[6]

---

[6] Toll records reflect that the Ray Phone Number and the Winget Phone Number had a significant number of contacts throughout the period of time relevant to the charged conduct.  For example,

27.  Based on my review of the CSA Business Email Account, I know that, between on or about July 3, 2020 and on or about July 7, 2020, Lender-1 and CSA Business exchanged numerous additional emails regarding closing on the PPP loan for CSA Business.  In the course of these emails, Lender-1 requested certain additional information and revised loan documentation from CSA Business, which CSA Business provided.

28.  Based on my review of records from Lender-1 and other bank records, I know the following:

a.    On or about July 7, 2020, the CSA Bank Account received funding from the PPP loan by means of a wire to the CSA Bank Account in the amount of $970,347.00.  The wire instructions provided by CSA Business to Lender-1 for payment provided an address in Manhattan for Bank-1.  The "Payment Detail Report" provided by the financial institution which services Lender-1 stated that the "beneficiary bank" of the wire was located in "New York, NY US" and included an American Bankers Association ("ABA") number for the beneficiary account that corresponds to the New York state locations of Bank-1.

b.    The $970,437.00 received into the CSA Bank Account was not used for legitimate payroll purposes.  Rather, much of the $970,437.00 was withdrawn from the CSA Bank Account through the following transactions:

i.    A $242,000 withdrawal on or about July 9, 2020, which was deposited into a bank account held at the same institution as Winget Personal Bank Account-1, but held in the name of WINGET, Winget's Wife, and a third individual ("Winget Personal Bank Account-2").

ii.    Nine wire transfers to Ray Personal Bank Account-1 totaling approximately $154,185.25 from on or about July 15, 2020 to on or about September 28, 2020.

iii.    Eleven wire transfers totaling $378,891.22 to private jet and/or other aviation-related companies between on or about July 8, 2020 and on or about September 23, 2020.

_____

between on or about June 9, 2020, when CSA Business first submitted a PPP application to Platform-1, and on or about July 7, 2020 when CSA Business received funding of its PPP loan from Lender-1, the Ray Phone Number and the Winget Phone Number had approximately 200 contacts by phone call.

*The 2021 PPP Applications*

29.   Based on my review of the CSA Business Email Account and records from Lender-1, I know that, from in or about January 2021 through in or about March 2021, CSA Business applied for additional PPP loans.  For example:

a.   On or about January 17, 2021, CSA Business submitted a Second Draw PPP application to Lender-1 (the "Lender-1 Second Draw PPP Application").  The Lender-1 Second Draw PPP Application sought a loan in the amount of $1,066,800, and claimed an average monthly payroll of $426,756 for 62 employees.  The Lender-1 Second Draw PPP Application claimed that gross receipts for CSA Business had been $4,512,761.00 in the fourth quarter of 2019 but decreased to $1,558,888.00 in the fourth quarter of 2020 – a decrease of considerably more than 25%, the required amount in order to qualify for a Second Draw loan.

b.   In connection with the Lender-1 Second Draw PPP Application, CSA Business provided to Lender-1, among other things, (i) an IRS Form 941 purportedly filed by CSA Business for the first quarter of 2020, (ii) an unsigned copy of an IRS Form 941 purporting to reflect information about CSA Business for the fourth quarter of 2019, and (iii) a purported copy of CSA Business's account statement for the CSA Bank Account for the period February 1, 2020 through February 28, 2020.  As described above, each of these documents was fraudulent.

c.   On or about January 30, 2021, almost two weeks after CSA Business submitted the Lender-1 Second Draw PPP Application, an employee of Lender-1 emailed CSA Business to notify it that the SBA had not approved the loan due to a number of "errors" in the application.  That email requested that CSA Business provide updated documentation in order to correct the errors.

d.   On or about February 13, 2021, the employee of Lender-1 again emailed CSA Business.  The employee noted that he was following up on his previous email, and that if Lender-1 did not receive a response by February 18, 2021, it would withdraw the Lender-1 Second Draw PPP Application.  It does not appear that CSA Business responded to this email.

e.   In addition, between in or about January 2021 and in or about March 2021, CSA Business started and/or submitted numerous other applications for PPP loans to various small business lending platforms and commercial lenders.

30.  Based on my review of publicly available information about PPP loans and participation in this investigation, I understand that CSA Business never obtained a Second Draw PPP loan or any other PPP loans after the PPP loan received in or about July 2021.

### The Joint Venture Fraud

*Overview*

31.  In or around December 2020, FRANKLIN RAY, the defendant, while residing in the state of Michigan, initiated discussions with principals of the Holding Company about creating the Joint Venture.  Specifically, RAY proposed that the Joint Venture would be in the logistics and trucking business.

32.  In connection with these discussions, FRANKLIN RAY, the defendant, represented to principals and employees of the Holding Company that CSA Business was an established trucking company that had derived significant revenues from the e-Commerce Company.  In truth and in fact, CSA Business had no significant business operations of any kind, and no business relationship with the e-Commerce Company.

33.  On or about December 29, 2020, FRANKLIN RAY, the defendant, sent an email to certain principals of the Holding Company stating that a $175,000 deposit payment would be necessary in order for RAY and CSA Business to take steps to set up the Joint Venture.  In that email, RAY identified certain expenses that would be paid with the funds from the deposit, and stated that he would "forward [r]eceipts and invoices as we use the funds."

34.  On or about December 29, 2020, after a phone call between RAY and a principal of the Holding Company, the Holding Company wired $175,000 to the CSA Bank Account.

35.  FRANKLIN RAY, the defendant, did not spend the funds received for the deposit consistent with the purposes stated in his December 29, 2020 email and other communications with the Holding Company.  Rather, RAY spent the funds on personal expenses, including paying for private airplane flights for himself and his family.

36.  The Joint Venture was never formed, and neither CSA Business nor FRANKLIN RAY, the defendant, ever returned any portion of the $175,000 deposit.

*The Scheme*

37.   Based on my communications with principals of the
Holding Company and my review of call records for the Ray Phone
Number and emails exchanged between FRANKLIN RAY, the defendant,
and the Holding Company, I know the following[7]:

       a.   In or about December 2020, the Holding Company
was soliciting offers to purchase an airplane (the "Aircraft")
owned by the Holding Company.  During that month, RAY contacted
a representative of the Holding Company and initiated efforts to
purchase the Aircraft.

       b.   On or about December 23, 2020, RAY sent a signed
copy of a contract to purchase the Aircraft to principals of the
Holding Company.

       c.   Around that time, RAY initiated a dialogue with
the Chairman of the Holding Company about entering into the
Joint Venture.  RAY stated that he lived in Michigan and had run
successful businesses in that state, and proposed that the Joint
Venture would be in the logistics and trucking business.

       d.   On or about December 25, 2020, RAY proposed that
he participate in a conference call with principals and other
employees of the Holding Company.  The Chairman of the Holding
Company agreed, and a conference call was scheduled for December
28, 2020.  The Holding Company sent RAY dial-in instructions for
the conference call.

       e.   On or about December 28, 2020, the RAY Phone
Number dialed into a conference call line shortly before 11:00
a.m. and stayed on the line for over 45 minutes.

       f.   In the course of discussing the Joint Venture
with principals of the Holding Company, including but not
exclusively on the December 28, 2020 conference call, RAY
claimed that CSA Business was a trucking company that had an
established relationship and derived significant revenues from
the e-Commerce Company.  RAY also claimed that he was personally
known to executives at the e-Commerce Company.

38.   Based on my review of records from the e-Commerce
Company, I know that, in truth and in fact, prior to December

---

[7] All emails between RAY and the Holding Company described herein
were sent and/or received by RAY at an email address at the
email domain "@csabusiness.com."

2020, CSA Business had no business relationship with and/or revenues derived from the e-Commerce Company.

39.   Based on my review of emails exchanged between FRANKLIN RAY, the defendant, and the Holding Company, I know the following:

a.   On or about December 29, 2020, at approximately 10:05 a.m., RAY sent an email to the Chairman and the President of the Holding Company with the subject "Deposit for setup."  In that email, RAY said that "[a]fter looking at things to be setup," a deposit of $175,000 would be necessary to "pay for things as we go."  RAY stated that this deposit would cover CSA Business's "time and expenses," and would be spent on items including "driver recruitment," "[s]afety [m]aterials needed for DOT/Driver Files," dispatch software, equipment for trucks, and work on a website.  RAY stated that CSA Business would "forward [r]eceipts and invoices as we use the funds."

b.   The Chairman of the Holding Company responded to the email to say that the President was in a meeting until 12:45 p.m. but that the President would call RAY before 1:00 p.m.

40.   Based on my review of call records, I know that, on December 29, 2020, the President of the Holding Company called the Ray Phone Number at 12:00 p.m. – that is, just under two hours after the email from RAY with the subject "Deposit for setup."  RAY and the President of the Holding Company spoke for over 20 minutes.[8]

41.   Based on my review of emails exchanged between FRANKLIN RAY, the defendant, and the Holding Company, I know that, on or about December 29, 2020, RAY emailed the President of the Holding Company, cc'ing the Chairman, and provided wire transfer instructions.  The wire instructions provided by RAY in that email were the wire instructions for the CSA Bank Account – that is, the same account and same wire instructions used by CSA Business to receive its EIDL and PPP loans.  The President of the Holding Company replied to RAY: "Will do."

---

[8] According to call records, the President also called the Ray Phone Number at 8:51 a.m. that morning and spoke for 16 minutes, and called again at 2:33 p.m. the same day and spoke for 2 minutes.  The call records also reflect that the Ray Phone Number called the President at approximately 11:57 a.m. that day.  That call lasted one minute.

42.   Based on my review of bank records, I know that, on or about December 29, 2020, the CSA Bank Account received a $175,000 wire from the Holding Company.   Prior to receiving this wire, the balance of the CSA Bank Account was just over $7,000.

43.   Based on my review of bank records, I know that, after the $175,000 wire was received into the CSA Bank Account, it was not spent in a manner consistent with the December 29, 2020 email.   For example:

a.   From on or about January 28, 2021 through on or about February 24, 2021, the CSA Bank Account sent six separate wire transfers totaling $39,400 to RAY Personal Bank Account-1.

b.   From on or about January 5, 2021 through on or about January 29, 2021, the CSA Bank Account made seven separate payments totaling $95,461.72 to pay outstanding bills owed on a credit card issued by another bank ("Credit Card-1").[9]

44.   Based on my review of account records, I know that Credit Card-1 was used for expenses unrelated to the Joint Venture, including the following:

a.   On or about January 6, 2021, Credit Card-1 was charged approximately $2,155.19 at a restaurant and approximately $7,016.48 at a hotel located in Miami Beach, Florida.

b.   On or about January 14, 2021, Credit Card-1 was charged $484.31 for a one night stay at a hotel in New York, New York where the Chairman of the Holding Company resides.   Based on my communications with employees of the Holding Company and my review of email correspondence, I understand this charge to correspond to the date that FRANKLIN RAY, the defendant, met in person with principals and employees of the Holding Company in Manhattan in order to discuss the Joint Venture.

c.   On or about January 15, January 28, February 1, and February 2, 2021, Credit Card-1 was charged $15,360, $48,333.37, $45,108.96, and $34,889.24, respectively, by a private jet charter company based in Long Island, New York (the "Private Jet Company").

---

[9] Credit Card-1 was held in the name of WINGET, but, as described herein, appears to have been used by RAY.

45.   Based on records provided by the Private Jet Company, I know the following with respect to the charges identified at paragraph 44.c *supra*:

a.   The $15,360 charge to Credit Card-1 on or about January 15, 2021 related to payment for a private jet flight from Ypsilanti, Michigan to Ronkonkoma, New York on December 17, 2020.  The invoice for the fight was issued to CSA Business, with attention to FRANKLIN RAY, the defendant.  The only identified passenger for the flight was RAY.

b.   The $48,333.37 charge to Credit Card-1 on or about January 28, 2021 related to payment for a private jet flight itinerary which included a round trip flight from Ypsilanti, Michigan to Teterboro, New Jersey on January 19, 2021, followed by a round trip flight from Ypsilanti, Michigan to Teterboro, New Jersey on January 19, 2021 and January 20, 2021.  The invoice for the flight was issued to CSA Business, with attention to RAY.  The identified passengers for the flights were RAY and certain members of RAY's family.

c.   The $45,108.96 charge to Credit Card-1 on or about February 1, 2021 related to payment for round trip private jet flight from Detroit, Michigan to Miami, Florida on January 5, 2021 and January 6, 2021.  The invoice for the flight was issued to CSA Business, with attention to RAY.  The identified passengers for the flights were RAY and seven other individuals.

d.   The $34,889.24 charge to Credit Card-1 on or about February 2, 2021 related to payment for a round trip private jet flight from Ypsilanti, Michigan to Ronkonkoma, New York on January 13, 2021 and January 14, 2021.  The invoice for the flight was issued to CSA Business, with attention to RAY. The only identified passenger for the flight was RAY.

46.   Based on my communications with principals and employees of the Holding Company, I understand that discussions between FRANKLIN RAY, the defendant, and the Holding Company ceased in or around early February 2021, and the Joint Venture was never formed.  I also know that the Holding Company never received any payment for the Aircraft, nor any receipts for or explanation of the use the $175,000 deposit provided by the Holding Company to CSA Business on or about December 29, 2020. The Holding Company also did not receive any reimbursement of those funds.

WHEREFORE, I respectfully request that warrants be issued for the arrests of FRANKLIN RAY and JOSEPH WINGET, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.


/s/ sworn telephonically
_____
Special Agent Robert N. Stout
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal
Procedure 41(d)(3) and 4.1 this 24th day of
February 2022

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK